## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| MATTHEW ZAKO,<br><br>        Plaintiff,<br><br>v.<br><br>ENCOMPASS DIGITAL MEDIA, INC.,<br><br>        Defendant. | No. 3:19-cv-844 (MPS) |

## RULING ON MOTION TO DISMISS

Plaintiff Matthew Zako brings employment discrimination and retaliation claims against his former employer, Defendant Encompass Digital Media, Inc. ("Encompass"), under the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the Connecticut Fair Employment Practices Act ("CFEPA"), along with state law tort claims. *See* Second Am. Compl., ECF No. 36 ("SAC"). Encompass moved to dismiss Zako's second amended complaint under Fed. R. Civ. P. 12(b)(6). ECF No. 42. For the reasons set forth herein, Encompass's motion to dismiss is GRANTED in part and DENIED in part.

## I.    FACTUAL ALLEGATIONS

The following facts are drawn from Zako's second amended complaint and are accepted as true for the purpose of this motion.

Matthew Zako, born in 1968, was over 40 years old when he was hired by Encompass in December 2011 as a freelancer in the operations department for a movie channel client. SAC ¶¶ 8–9. After a year, Zako "was promoted to 'Assistant Editor' in the Post Production Department for the client, A&E networks." *Id.* ¶ 10. In this position, Zako earned "only positive reviews"

1

from his supervisor, Jim Harvey. After a few years, in approximately March 2017, A&E was "downsizing the number of assistant editors from five to three." Zako, who was the second-most-senior employee in the department, was told that he would be moved back to operations; the three assistant editors who remained in the Post Production Department were under the age of 40. *Id.* ¶ 11.

Zako told his supervisor that he could not move back to the operations department because the role required working overnight shifts, and Zako needed to be home at night to supervise and care for his son, who has a mental disability. *Id.* ¶ 12. Zako also explained to his supervisor that he had a medical condition called "Grosshematuria disease," which causes frequent urination, and can cause bleeding in the "lower urinary trac[t]" if Zako is "not able to urinate immediately as needed." *Id.* ¶¶ 1, 12. This condition made it difficult for Zako to work in operations since he was required to "ask permission every single time he needed to take a bathroom break." *Id.* ¶ 12. Zako also discussed these concerns with the Director of Operations, Andre Jean-Francois, who told Zako, "Don't worry. It won't be an issue because we have plenty of young guys that are willing to do the overnights," and "Don't worry you can take plenty of bathroom breaks as needed." *Id.* ¶ 13.

Zako was indeed reassigned to operations in March 2017 and was "intentionally scheduled for overnights," such that he had to ask his coworkers for "favors" to swap schedules. *Id.* ¶¶ 13–14. One of his supervisors in this role, Frank Albore, "was constantly harassing him and making offensive and embarrassing comments related to his frequent use of the bathroom," often commenting, "I would never want to take a road trip with you in the car." *Id.* ¶ 14. Mr. Zako complained to Jean-Francois on April 17, 2017, sending an email asking him "to talk to

Frank Albore about his mistreatment and harassment regarding his need to urinate frequently." *Id.* ¶ 15. Jean-Francois did not respond.

On April 30, 2017, Zako was at work and asked Albore for a bathroom break. *Id.* ¶ 16. Albore said, "No, I cannot give you a bathroom break right now." *Id.* Zako was "distress[ed] and upset[]" since he had already "been holding in his need to urinate" for four hours, and was "in pain and worried that he would start to bleed." *Id.* Zako told Albore that he "could not hold it in any longer and proceeded to go to the bathroom." *Id.* When he returned from the bathroom, Albore told him, "I do not like your attitude, go home." *Id.* Zako said that he was not going to go home for using the bathroom and that he would call Jean-Francois. *Id.* In response, Albore "approached and lunged at [Zako] in an aggressive manner and said 'Why? We don't need to. We can settle this man to man.'" *Id.*

Immediately after this incident, Zako emailed Jean-Francois again to complain about the incident and about the "refusal to accommodate" his "need to urinate frequently." *Id.* ¶ 17. Jean-Francois again did not respond. The next day, on May 1, 2017, Zako reported the incident to Human Resources. *Id.* ¶ 18. Zako attended a meeting via videoconference with Jean-Francois and the HR department, and he provided a medical note explaining his "lower urinary trac[t] syndrome" and his need for "frequent urination" in order to avoid bleeding. *Id.*

Following this meeting with HR, Zako started getting "written up" at work, even though his performance did not change. *Id.* ¶ 19. He "documented and rebutted these sham and unfounded reviews in a series of emails to [Jean-Francois]." *Id.* Zako also kept a log of the incidents when he was "written up for no sound or legitimate reason." *Id.* ¶ 21. Zako also alleges that, after he complained to HR in April 2017, "Defendant made his work environment even more miserable, hostile and difficult" and that he was "labeled a bad seed." *Id.* ¶ 20.

In Fall 2017, Zako asked Jean-Francois if he could apply for advancement opportunities within the company. *Id.* ¶ 25. Jean-Francois responded, "No because they all require you to do overnights which you cannot do because of your bathroom issues." *Id.* ¶ 25. Zako alleges "there were other positions in the company that did not require overnights." *Id.* In March 2018, Zako asked Jean-Francois whether he could apply for an open position as an operator for the client E11 Sports Network; Jean-Francois told him that he could apply, but that the position required working overnight shifts. *Id.* ¶ 26. When Zako pointed out that the person previously in that position "never worked overnights," Jean-Francois responded, "Well you might have to." *Id.* ¶ 26. A 30-year-old employee who had been with Encompass for only one year was promoted to the E11 Sports Network position; that younger employee has not required a single overnight shift. *Id.* ¶ 27.

In June 2018, Zako learned of an "open Streaming position" and "wrote to [Jean-Francois] requesting that he be considered for this position." *Id.* ¶ 28. Jean-Francois did not respond to the email. That summer 2018, Zako learned that his "pod" and its jobs "would be eliminated and outsourced" to a team in India. *Id.* ¶ 29. He asked Jean-Francois if he could be moved to another client, but Jean-Francois did not respond to his emails. *Id.* ¶ 29. During this period, "younger, less experienced operators," all under the age of 40, were moved to other pods within the company, into positions that paid more than Zako's position. *Id.* Zako alleges that his pod in fact "did NOT move overseas and upon information and belief a younger 32-year-old male has recently been hired for that Pod here in the [S]tates." *Id.* ¶ 30.

On August 12, 2018, Zako emailed Jean-Francois to complain that another supervisor, Mike Zanzitis, was "giving him a hard time, harassing and mistreating him when he asked to go to the bathroom." *Id.* ¶ 22. Specifically, Zanzitis would "shake his head in disgust, act in a

demeaning fashion, get angry and cause [Zako] to feel embarrassed for having to use the bathroom often." *Id.* Jean-Francois did not respond to the email.

Around August 2018, several employees in Zako's "Pod" resigned and were replaced by younger employees under 40. *Id.* ¶ 24. Another new pod hired only younger employees under the age of 40. *Id.* Some of these new employees were promoted after just a year to a position that paid a higher salary. *Id.* In October 2018, Zako saw a job posting for a position as a "Pivot Operator" and asked Jean-Francois if he could apply; Jean-Francois did not respond. *Id.* ¶ 35.

On October 22, 2018, Zako attended a meeting with Jean-Francois and was terminated; he was told that his last day would be November 1 and that the reason for his termination was "job elimination." *Id.* ¶ 37. Zako alleges that, contrary to Jean-Francois's statements, "no jobs have been eliminated" from the company. *Id.* ¶ 38.

Zako alleges that, as a result "the way [he] was treated at work," he experienced "mental stress, anxiety, depression, headaches, los[s] of sleep, loss of consortium, loss of hair, feelings of helplessness, and loss of weight." *Id.* ¶ 52.

## II.   PROCEDURAL HISTORY

On November 19, 2018, Zako filed a "dual charge" of discrimination against Encompass with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the U.S. Equal Employment Opportunity Commission ("EEOC"). He received a "Notice of Right to Sue" letter from the EEOC on May 13, 2019, and from the CHRO on May 31, 2019. ECF No. 36 at 29–30.

Zako initiated this action on May 31, 2019 by filing a complaint against Encompass. Zako amended his complaint in August 2019 in order to correct the caption. Encompass moved to dismiss the complaint in October 2019. I ordered Zako either to file a response or to "file an

amended complaint in which he pleads as many facts as possible, consistent with Rule 11, to address the alleged defects discussed in the defendant's . . . memorandum of law," noting that "[t]he Court will not allow further amendments after November 25, 2019." ECF No. 35. Zako filed a second amended complaint on November 19, 2019, ECF No. 36, and Encompass renewed its motion to dismiss on January 8, 2020, ECF No. 42, incorporating its prior memorandum of law, ECF No. 32-1, and setting forth additional arguments, ECF No. 42-1. Zako filed an opposition brief, ECF No. 45, and Encompass filed a reply, ECF No. 46.

## III.    LEGAL STANDARD

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must determine whether the plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted)). While the Court must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims. . . ." *Scott v. Town of Monroe*, 306 F.Supp.2d 191, 198 (D. Conn. 2004).

## IV.    DISCUSSION

Zako's second amended complaint includes ten counts: age discrimination in violation of the ADEA and CFEPA (Counts One and Two), disability discrimination in violation of the ADA and CFEPA (Counts Three and Four), associational disability discrimination in violation of the

ADA and CFEPA (Counts Five and Six), retaliation in violation of the ADA and CFEPA (Counts Seven and Eight), intentional infliction of emotional distress (Count Nine), and a hostile work environment (Count Ten).

## A. Age Discrimination Claims (Counts One and Two)

Zako alleges that Encompass discriminated against him on the basis of his age by subjecting him to "unequal, disparate treatment and to a series of continuous and ongoing adverse employment actions . . . including but not limited to being disparately and unfairly evaluated and disciplined, being the victim of 'downsizing', being denied raises and bonuses, being denied internal opportunities for advancement, being set up to fail, being ignored and humiliated, and ultimately being terminated," all in violation of the ADEA and CFEPA. SAC ¶¶ 58, 68.

"Age discrimination claims brought under the CFEPA are generally evaluated under the same standards that govern the ADEA." *Weisenbach v. LQ Mgmt.*, No. 3:13-CV-01663 (MPS), 2015 WL 5680322, at *5 n.5 (D. Conn. Sept. 25, 2015). Under the ADEA, it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or] to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a). "[A]t the motion to dismiss stage, an ADEA plaintiff need not plead every element of a prima face case, only facts which plausibly suggest that (1) the employer took an adverse action and (2) age was the 'but for' cause of that adverse action." *Boonmalert v. City of New York*, 721 F. App'x 29, 32 (2d Cir. 2018); *see also Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002) ("[A]n

employment discrimination plaintiff need not plead a prima facie case of discrimination"). The plaintiff has a "minimal burden" at this stage of alleging facts "suggesting an inference of discriminatory motivation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015).

### 1. *Time-Barred Claims*

Encompass moves to dismiss Zako's age discrimination claims, arguing first that much of the conduct Zako challenges is time-barred. I agree with Encompass that much—though not all—of the conduct Zako alleges is time-barred. "A plaintiff seeking to recover under the ADEA must file a discrimination charge with a state agency within 300 days of the occurrence of the allegedly unlawful employment practice." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); 29 U.S.C. §626(d)(2). A CFEPA claim must be filed with the CHRO within 180 days of the alleged "act of discrimination." Conn. Gen. Stat. § 46a-82(f). Zako filed his charge with the EEOC and the CHRO on November 19, 2018. SAC ¶ 2. Therefore, his ADEA claim must be premised on events occurring on or after January 23, 2018, and his CFEPA claim must be premised on events occurring on or after May 23, 2018.

Zako argues that he has asserted the "continuing violation doctrine" in his second amended complaint, which "provid[es] sufficient basis to defeat a Motion to Dismiss for claims Defendant argues are untimely." ECF No. 45 at 6–7. On the contrary, Zako has not pled sufficient facts for that doctrine to apply, notwithstanding his conclusory statement that "Defendant's acts towards Plaintiff fall under the Continuing Violation Doctrine as they were all related to a continuous and ongoing pattern of discriminatory and retaliatory behavior." SAC ¶ 1. The continuing violation doctrine provides an exception to the 300-day filing period, allowing plaintiffs to sue based on adverse acts that would otherwise be time-barred but "were part of a

continuing policy and practice of prohibited discrimination." *Valtchev v. City of New York*, 400 F. App'x 586, 588 (2d Cir. 2010). Zako does not point to any policy or practice of age discrimination at Encompass: he does not allege that any other employees over the age of 40 were terminated or otherwise discriminated against or that the company used any "mechanisms such as discriminatory seniority lists." *Id.* at 588–89 ("[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." (internal quotation marks omitted)). Rather, he alleges discrete incidents in which he was not promoted and was ultimately terminated while younger employees were promoted. Both termination and failure to promote are "considered 'discrete acts' which are 'easy to identify' and claims based on each are barred if not timely filed." *Id.* at 588; *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"). Because Zako does not allege any specific discriminatory policy or practice at Encompass, and makes only conclusory allegations in an attempt to invoke the continuing violation doctrine, the doctrine does not apply. So any events occurring before January 23, 2018 are time-barred for the purposes of his ADEA claim, and any events occurring before May 23, 2018 are time-barred for the purposes of his CFEPA claim. Nevertheless, "evidence of earlier promotion denials may constitute relevant background evidence in support of a timely claim," and this Court will consider it as such. *Petrosino v. Bell Atl.*, 385 F.3d 210, 220 (2d Cir. 2004).

## 2. *Adverse Acts*

Zako's second amended complaint does describe incidents occurring after January 23, 2018, such as his inquiries about other job openings at the company in March, June, and October

2018 and his termination in October 2018. The parties agree that at least the October 2018 termination constitutes an adverse act and is within the actionable time period for both his ADA and CFEPA claims, but Encompass argues that the other incidents do not constitute adverse acts.

In the Second Circuit, in order to establish a prima face case of discriminatory failure to promote, including in ADEA suits, the plaintiff ordinarily must demonstrate that (1) he is a member of a protected class; (2) he applied for promotion to a position for which he was qualified; (3) he was rejected for the position; and (4) the position remained open and the employer continued to seek applicants. *Mauro v. S. New Eng. Telecomms., Inc.*, 208 F.3d 384, 386 (2d Cir. 2000). While a "discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible." *E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014) (internal quotation marks and citations omitted).

Zako does not allege that he actually applied for any job openings during the relevant period. *See* SAC ¶¶ 26, 28–29, 35. At most, he asked to "be considered" for an open position in June 2018, SAC ¶ 28, but "such a general expression of interest is not enough." *Shah v. Tunxis Cmty. Coll.*, No. 3:14-CV-00712 MPS, 2015 WL 4254909, at *4 (D. Conn. July 14, 2015); *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004) ("[T]he second element of a prima facie case cannot be established merely with evidence that a plaintiff generally requested promotion consideration."). "Some courts hold that a plaintiff's claim must be dismissed if it fails to demonstrate that the plaintiff applied for a specific position." *Shah*, 2015 WL 4254909, at *4 (internal quotation marks and alterations omitted). However, other courts in this Circuit have denied motions to dismiss when plaintiffs "plausibly alleged that they were qualified for

particular openings" and that "they would have applied for the position but were precluded from doing so." *Id.* (internal quotation marks omitted); *see Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 443 (S.D.N.Y. 2014) (finding plaintiff stated a claim when she alleged "that she discussed a particular opening with her manager, that he emphasized that she was competing against 'two very well qualified candidates' who were both male, and that, based on his statements, she 'understood' that he 'was clearly advising her not to apply.'").

Zako alleges that in March 2018, he asked Jean-Francois if he could apply to an open position, and Jean-Francois told him "he could but again this position required doing overnights." SAC ¶ 26. Zako told him that the outgoing person in that position never worked overnights, and Jean-Francois replied, "Well you might have to." *Id.* Like the *Barrett* plaintiff, Zako understood Jean-Francois's reply as "essentially a no." *Id.* Moreover, Zako alleges that when he started working in operations, Jean-Francois told him, "Don't worry [about not being able to work overnight shifts]. It won't be an issue because we have plenty of young guys that are willing to do the overnights." *Id.* ¶ 13. Zako has thus plausibly alleged that the company's overnight shifts favored young employees and that he was consequently precluded from applying for a promotion in March 2018. On the basis of these allegations, I find he has alleged one instance of failure to promote in March 2018 that is actionable under the ADA. *See Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993) ("[A] plaintiff's failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor.").[1]

---

[1] Although Zako also alleges that he saw a job posting for a "Pivot Operator" in October 2018, asked Jean-Francois about it, and Jean-Francois never responded, SAC ¶ 35, Zako makes no further allegations about that position—including whether it was filled at all or whether he was otherwise discouraged from applying for it. This allegation is insufficient to support a failure-to-promote claim.

### 3.   *But-For Causation*

Finally, Encompass argues Zako failed to allege plausibly that his age was the "but for"
cause" of any adverse actions, including his termination. At the motion to dismiss stage, an
ADEA plaintiff faces a "minimal burden" and need only allege facts "suggesting an inference of
discriminatory motivation." *Vega*, 801 F.3d at 85. "An inference of discrimination can arise from
circumstances including . . . more favorable treatment of employees not in the protected group."
*Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

Regarding Encompass's alleged failure to promote him, Zako alleges that Encompass
instead promoted younger employees to the positions about which he expressed interest. *E.g.*,
SAC ¶ 27 (A 30-year-old with less tenure was promoted to the position Zako asked to apply for
in March 2018.). Courts have held that an allegation that an open position went to a less qualified
employee outside of the protected class is "sufficient to establish an inference of discrimination."
*Shah*, 2015 WL 4254909, at *3. And regarding his termination, Zako alleges that Encompass
provided a pretextual reason for his termination: Encompass told him that his pod was being
outsourced to a team in India and his job eliminated, but Zako later "learned that the Pod did
NOT move overseas" and that "no jobs have been eliminated." SAC ¶¶ 29–30, 38. Zako also
alleges that the company hired a 32-year-old for that pod in the United States, *id.* ¶ 30;
construing this allegation in Zako's favor, he alleges that Encompass replaced him with a 32-
year-old employee. And he alleges that while he was terminated, purportedly due to job
elimination, younger employees were "moved to other Pods within the company and were not
eliminated from the company." *Id.* ¶ 31. These allegations, taken together, satisfy Zako's
minimal burden to raise an inference of discrimination. *See Gonzalez v. Carestream Health, Inc.*,
520 F. App'x 8, 10 (2d Cir. 2013) (Plaintiff's "complaint alleged that he is a 60-year old man

with 'stellar' performance evaluations, who was terminated for pretextual reasons. When combined with his allegation that [defendant] maintained substantially younger workers, we find that no further amplification was necessary to state a plausible claim of age discrimination.").[2]

Therefore, I find that Zako has plausibly alleged age discrimination under the ADEA and CFEPA, and I deny the motion to dismiss as to Counts One and Two.

## B. Disability Discrimination Claims (Counts Three and Four)

Zako also alleges that he was discriminated against on the basis of disability—namely, his "Grosshematuria disease," a lower urinary tract condition requiring frequent urination—in violation of both the ADA and CFEPA. SAC ¶¶ 73–92. Because he alleges both that he was passed over for promotions and terminated because of his disability and that Encompass refused him requested accommodations, SAC ¶ 77, I construe Zako's second amended complaint to raise disability discrimination claims premised both on adverse employment actions and failures to accommodate. Encompass argues that Zako is not "disabled" under the ADA or CFEPA, that it accommodated his needs by permitting him to use the bathroom, and that Zako failed to allege that his disability motivated any adverse actions taken against him.

---

[2] Encompass argues that, because it hired Zako when he was 43 years old and already a member of a protected class, "any inference of age discrimination when the plaintiff's employment is terminated is undermined." ECF No. 32-1 at 12; see Jackson v. Post Univ., Inc., 836 F. Supp. 2d 65, 87 (D. Conn. 2011) (explaining that the "same actor inference" in ADEA cases "provides that when the same actor hires and also fires a person in a protected class, there is a presumption against an inference of discrimination"); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 132 (2d Cir. 2000) ("The premise underlying this [same actor] inference is that if the person who fires an employee is the same person that hired him, one cannot logically impute to that person an invidious intent to discriminate against the employee."). Here, Plaintiff does not allege that the actors who decided to hire him were the same as those who decided to fire him. Therefore, I do not find that Zako's age when he was hired makes his allegations of discriminatory motivation implausible.

### 1. *Disability*

Title I of the ADA prohibits employers from discriminating against any "qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Claims for violations of the CFEPA are analyzed under the same standards as claims for violations of the ADA." *Chasse v. Computer Sciences Corp.*, 453 F.Supp.2d 503, 514 n. 4 (D.Conn. 2006). To establish a prima facie case of disability discrimination, a plaintiff must show "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." *Brady v. WalMart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008). However, as discussed above, plaintiffs in employment discrimination cases, including ADA discrimination cases, are not required to establish a prima face case at the motion to dismiss stage. *Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015). At this stage, "a plaintiff need only give plausible support to a minimal inference of discriminatory motivation." *Id.*

Encompass argues that Zako was not disabled within the meaning of the ADA. ECF No. 32-1 at 16. "To be considered disabled, a plaintiff must have a 'physical or mental impairment that substantially limits one or more major life activities . . . or be[] regarded as having such impairment.'" *Kopchik v. Town of E. Fishkill, New York*, 759 F. App'x 31, 37 (2d Cir. 2018) (quoting 42 U.S.C. § 12102(1)). "[A] regulation enacted pursuant to the ADA Amendments Act of 2008 [ADAAA] provides that '[t]he term "substantially limits" shall be construed broadly in

14

favor of expansive coverage, . . . [and] is not meant to be a demanding standard.'" *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)(i)). Under that regulation:

> An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii). Major life activities include "[t]he operation of a major bodily function, including . . . digestive, genitourinary, bowel, bladder . . . functions." *Id.* § 1630.2(i)(1)(ii). "In considering whether a major life activity is substantially limited by an impairment, courts consider the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Mazzeo v. Mnuchin*, 751 F. App'x 13, 15 (2d Cir. 2018) (internal quotation marks omitted). A plaintiff may also state a claim of discrimination under the ADA if he pleads that he was fired because he was "regarded as disabled." "An individual meets the requirement of being regarded as having such an impairment if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

Encompass claims that frequent urination does not substantially limit a major life activity, citing *Giles v. NBC Universal, Inc*., No. 10 CIV. 7461 DAB, 2011 WL 4376469, at *5 (S.D.N.Y. Sept. 20, 2011). ECF No. 32-1 at 17. But while *Giles* itself was decided after the ADAAA was passed, it relies on caselaw predating the ADAAA and does not address the regulation instructing courts to construe broadly the term "substantially limits." Encompass also cites a more recent case, *Fasan v. McRoberts Protective Agency Inc.*, No. 13-CV-4658 RRM LB,

2015 WL 1285909, at *4 (E.D.N.Y. Mar. 20, 2015), which held that the plaintiff's "frequent urination does not qualify as a disability under the ADA." But *Fasan* is distinguishable because the court was ruling on a summary judgment motion and because the plaintiff in that case "d[id] not allege that his diabetes and his frequent urination condition constitute[d]" a limitation of a major life activity as compared to most people in the general population. *Id.* at *4 (The plaintiff "does not offer any medical evidence that his diabetes requires frequent trips to the restroom" and "does not claim that his trips to the restroom are so frequent or so unpredictable as to render him unable to do his job. In fact, the evidence demonstrates the opposite—the logbook entries show that he was capable of working 8- and 12-hour shifts without needing a single bathroom break"). The *Fasan* court contemplated that "frequent urination, under more drastic circumstances than found here, could potentially qualify as a disability under the ADA," and Zako has alleged more drastic circumstances. Specifically, he alleged that he has a diagnosed condition called "Grosshematuria disease" that required frequent urination, and that "if he is not able to urinate immediately as needed, he bleeds from his lower urinary trac[t]." SAC ¶ 1. He also alleged that "employees in this department are not allowed to go to the bathroom until a supervisor or pivot operator can cover monitoring the TV screens," so his access to the restroom was limited while working. *Id.* ¶ 16. When he was required to "hold[]in his need to urinate for more than a few hours" in April 2017, Zako "was in pain and worried that he would start to bleed, as is the case when he is not able to immediately relieve himself as needed." *Id.*

Based on these allegations, Zako has plausibly alleged that he has a disability within the meaning of the ADA—a physical impairment that substantially limits his urinary function as compared to most people in the general population. Zako's ability to "perform the essential functions of his job," SAC ¶ 1, is not mutually exclusive with an allegation of an impairment that

16

substantially limits a major life activity, since "an impairment that substantially limits one major life activity need not substantially limit *other* major life activities." *Kopchik*, 759 F. App'x at 37 n.6. Given the regulatory instruction to construe the ADA "broadly in favor of expansive coverage," I find that Zako's allegations of disability under the ADA are sufficient at this stage of the litigation.[3]

Moreover, even if Zako were not disabled under the ADA, he has also alleged that he was "regarded as" disabled by Encompass. *See* 42 U.S.C. § 12102(1). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3); *see also Gentleman v. State Univ. of N.Y.–Stony Brook*, No. 16-CV-2012, 2017 WL 2468963, at *4 (E.D.N.Y. June 6, 2017) ("Notably, . . . the ADA Amendments Act of 2008 ('ADAAA') set forth a new, more lenient, standard for determining whether an individual is 'regarded as disabled.'"). Supervisor Frank Albore "ma[de] offensive and embarrassing comments related to his frequent use of the bathroom," such as, "I would never want to take a road trip with you in the car." SAC ¶ 14. Another supervisor, Mike Zanzitis, would "shake his head in disgust, act in a demeaning fashion, get angry and cause [Zako] to feel embarrassed for having to use the bathroom often." *Id.* ¶ 22. Jean-Francois was aware of Zako's need to use the bathroom frequently, made reference to Zako's "bathroom

---

[3] "The CFEPA definition of physical disability is broader than the ADAAA definition because it does not require that a plaintiff's impairment substantially limit major life activities. The CFEPA defines physical disability as 'any chronic physical handicap, infirmity or impairment . . . .'" *Boutillier v. Hartford Pub. Sch.*, 221 F. Supp. 3d 255, 274 (D. Conn. 2016) (quoting Conn. Gen. Stat. § 46a-51(15)). Therefore, Zako has adequately alleged a disability under the CFEPA as well.

issues" in Fall 2017, and received an email in August 2018 complaining about Zanzitis's behavior. *Id.* ¶¶ 22, 25. Zako has thus alleged that Encompass regarded him as having a physical impairment.

***

Zako's allegations give "plausible support to a minimal inference of discriminatory motivation." *Dooley*, 636 F. App'x at 21. As discussed above, Zako has alleged a March 2018 failure-to-promote claim that is not time-barred under the ADA and alleged an October 2018 termination claim that is not time-barred under either the ADA or CFEPA. As discussed above, Zako alleges that other non-disabled employees were promoted and were not terminated, that Encompass's stated reason for his termination was pretextual, and that at least two supervisors made demeaning comments about his need to urinate frequently. These allegations are sufficient, at this stage, to plead a claim of discrimination under the ADA. Therefore, I deny the motion to dismiss Zako's disability discrimination claims as they relate to the actionable adverse employment actions described above—namely, the March 2018 failure to promote (with respect to his ADA claim) and the October 2018 termination (with respect to both his ADA and CFEPA claim).

### 2. *Failure to Accommodate*

"Discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)(A)). "A plaintiff states a prima facie failure to accommodate claim by

18

demonstrating that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013) (internal quotation marks omitted). Plaintiff also "must plead sufficient facts to raise the inference that the failure was motivated by discriminatory intent." *Novick v. Vill. of Wappingers Falls, New York*, 376 F. Supp. 3d 318, 337 (S.D.N.Y. 2019) (internal quotation marks omitted). "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. N.Y.S. Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (quoting 29 C.F.R. § 1630.2(o)(3)). "[T]he ADA places a duty on employers to ascertain whether there are some jobs that the employee might be qualified for." *Felix v. N.Y.C. Transit Auth.*, 154 F.Supp.2d 640, 655 (S.D.N.Y. 2001).

As discussed above, Zako has alleged that he is disabled under the meaning of the ADA and that Encompass had notice of that disability. Zako states he requested reasonable accommodations but was denied and that Encompass "refused to engage in the interactive reasonable accommodation process" with him." SAC ¶ 77–78. Specifically, when he was first assigned to the operations department, he told Jean-Francois about his "lower urinary trac[t] condition called Grosshematuria disease," *id.* ¶ 12, and "explained . . . he had to use the bathroom frequently because of his serious bladder syndrome and asked that he be so accommodated for this disability," *id.* ¶ 13. Thereafter, Zako sent Jean-Francois a number of emails raising concerns about having to ask his supervisors every time he needed to use the bathroom. *See id.* ¶¶ 14–15, 17–18, 22. In June 2018, during the actionable period, Zako asked

19

Jean-Francois that he be considered for an "open Streaming position" and "noted that this would be a great department for him to work in as this department does not require employees to ask permission for bathroom breaks." *Id.* ¶ 28. But Jean-Francois did not respond. *Id.* In addition, although Jean-Francois told Zako when he started in the operations department that he "can take plenty of bathroom breaks as needed," in reality Zako had to ask his supervisors every time he needed to use the bathroom. *Id.* Zako also alleges that "there were never any interactive conversations or any measures taken at all by Defendant to address his requests for accommodation or to otherwise discuss how Defendant could address his concerns regarding . . . having to request permission to take a bathroom break." *Id.* ¶ 13. Finally, he alleges that supervisors harassed and teased him about his condition and that Jean-Francois told him he could not apply for another job because "they all require you to do overnights which you cannot do because of your bathroom issues." *Id.* ¶ 25. These allegations suffice to raise an inference of discriminatory intent.

Upon notice of an employee's disability, the ADA requires employers to "engage in an interactive process with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated." *Brady*, 531 F.3d at 135 (internal quotation marks omitted). Because Zako alleges that Encompass was on notice of his disability and received his requests for accommodations yet failed to engage in that process, he has adequately pled a failure to accommodate claim. *See Novick*, 376 F. Supp. 3d at 339 (denying motion to dismiss failure to accommodate claim where plaintiff, a police officer who suffered from bladder cancer, asked to be temporarily relocated to a desk job so that he could be closer to a bathroom but was repeatedly denied). Therefore, I deny the motion to dismiss Zako's failure to accommodate claims.

**C.** __Associational Disability Discrimination Claims (Counts Five and Six)__

Zako also alleges that Encompass discriminated against him on the basis of his son's

disability. SAC ¶ 97. The ADA prohibits "excluding or otherwise denying equal jobs or benefits

to a qualified individual because of the known disability of an individual with whom the

qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). As

Encompass notes, the Second Circuit recognizes three circumstances that would give rise to a

claim of associational discrimination:

> 1) "expense," in which an employee suffers adverse action because of his association
> with a disabled individual covered by the employer's insurance, which the employer
> believes (rightly or wrongly) will be costly;
> 2) "disability by association," in which the employer fears that the employee may
> contract or is genetically predisposed to develop the disability of the person with whom
> he is associated; and
> 3) "distraction," in which the employer fears that the employee will be inattentive at work
> due to the disability of the disabled person.

*Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016). I agree with Encompass

that Zako has not alleged any facts suggesting that any of these three circumstances apply.

Zako's allegations do not even hint at the first two circumstances. As to the third, Zako cites only

one case in support of this claim in his opposition brief, ECF No. 45 at 31 (citing *Kelleher v. Fed*

*A. Cook, Inc.*, 939 F.3d 465 (2d Cir. 2019)).[4] But in that case, the plaintiff alleged that his

employer "thought that [his] daughter was a distraction, and concern over distraction was a

'determining factor' in [his] termination." *Kelleher*, 939 F.3d at 470. By contrast, Zako makes no

factual allegations suggesting that Encompass's failure to promote him or its terminating him

related to his son's disability. Although Zako alleges that he told Jean-Francois he could not

---

[4] In this section of his opposition brief, Zako also writes that he "incorporates herein, in its
entirety, Plaintiff's Memorandum in Opposition to Defendant's First Motion to Dismiss." ECF
No. 45 at 32. But as Encompass points out, ECF No. 46 at 1 n.1, Zako never filed any such
memorandum.

work overnight hours because of his son, the complaint does not suggest that Jean-Francois or any other supervisor thought Zako's son would distract him during the daytime hours he was working. *See Graziadio*, 817 F.3d at 432–33 (noting that an associational disability discrimination claim requires evidence that the plaintiff's employer "suspected distraction or concern [for the family member] would cause [plaintiff] to perform her work inadequately" while at work, and that evidence of an employer's feeling that the plaintiff "had taken too much leave *from work* to care for [family members]" does not suffice (emphasis in original)). Further, the complaint suggests that Jean-Francois was denying Zako promotional opportunities because of his perception that Zako's "bathroom issues," not his son, prevented him from working overnight hours. SAC ¶ 25 (alleging that Jean-Francois said he could not apply for other job opportunities "because they all require you to do overnights which you cannot do because of your bathroom issues"). Therefore, I grant the motion to dismiss Zako's associational disability discrimination claims (Counts Five and Six).

### D.  **Retaliation Claims (Counts Seven and Eight)**

Zako alleges that he was retaliated against after engaged in protected activity, in violation of the ADA and CFEPA. SAC ¶¶ 111, 117. Specifically, he alleges that Encompass took adverse actions against him—including failures to promote him and his termination—after he complained about "disability discrimination on countless occasions." SAC ¶ 108. Encompass moves to dismiss these claims, arguing that Zako's allegations are conclusory and speculative. ECF No. 32-1 at 24–25.

"For a claim of retaliation to survive under the ADA, a plaintiff must, inter alia, provide evidence sufficient to make out a prima facie case. The prima facie case consists of four elements: (1) the employee was engaged in a protected activity under the ADA, (2) the employer

was aware of the activity, (3) an adverse employment action occurred with respect to plaintiff, and (4) a causal connection exists between the protected activity and the adverse employment action." *Valtchev v. City of New York*, 400 F. App'x 586, 589 (2d Cir. 2010) (internal citations omitted). Protected activities include "complaints of ADA discrimination, including complaints on a good faith belief that the employer's actions violated the ADA, and requests for reasonable accommodations." *Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 18 (2d Cir. 2017). Courts "analyze a retaliation claim under the ADA using the same framework employed in Title VII cases." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001).

Zako has alleged sufficient facts to satisfy each of these elements. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Dipinto v. Westchester Cty.*, No. 18-CV-793 (KMK), 2019 WL 4142493, at *8 (S.D.N.Y. Aug. 30, 2019). "The complaint can be informal—an employee does not need to lodge a formal complaint of discrimination." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) (citations omitted). Rather, the employee's "complaint must be sufficiently pointed to be reasonably understood as a complaint of discrimination." *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-2456, 2013 WL 1211496, at *9 (E.D.N.Y. Mar. 25, 2013) (citation and quotation marks omitted), *aff'd*, 597 F. App'x 19 (2d Cir. 2015); *see also Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 (2d Cir. 2015) (holding that a plaintiff "must allege that [her employer was] on notice that [her] complaints were about [statutorily prohibited] discrimination, not just general unsatisfactory or unfair conduct"); *Groth v. Grove Hill Med. Ctr., P.C.*, No. 3:14-CV-01563 RNC, 2015 WL 4393020, at *5 (D. Conn. July 15, 2015) (A plaintiff's "complaint itself must put the employer on notice that the employee is complaining about discrimination.").

Zako alleges that he complained to Jean-Francois on multiple occasions about supervisors "harassing him and making offensive and embarrassing comments related to his frequent use of the bathroom due to his bladder syndrome." SAC ¶ 14. These complaints to Jean-Francois began in at least March 2017, when Zako complained about Frank Albore's "mistreatment and harassment regarding his need to urinate frequently" and also about the company's "refusal to accommodate him" for his "need to urinate frequently, *id*. ¶¶ 14–15, 17, and continued until at least August 12, 2018, when Zako "wrote [Jean-Francois] another email explaining that Supervisor[] Mike Zanzitis was giving him a hard time, harassing and mistreating him when he asked to go [to] the bathroom," *id*. ¶ 22. While these were not necessarily formal complaints, and while Zako does not allege that he specifically cited the ADA, construing all doubts in his favor, he did specifically complain to Jean-Francois both about harassment on the basis of his disability and about a "refusal to accommodate" his disability. I find that Zako has therefore alleged that Encompass was on notice that Zako was complaining about disability discrimination.

Zako has also pled sufficient facts at this stage to raise an inference of causation between his complaints to Jean-Francois and an adverse employment action. Zako complained to Jean-Francois about Zanzitis's "harassing and mistreating him when he asked to go [to] the bathroom" on August 12, 2018, SAC ¶ 22, and Zako was terminated by Jean-Francois two months later on October 22, 2018, *id*. ¶ 37. "[C]ausality can be inferred from the fact that the protected activity was closely followed in time by the adverse action." *Young v. Westchester Cty. Dep't of Soc. Servs.*, 57 F. App'x 492, 495 (2d Cir. 2003) (internal quotation marks omitted). In its briefs, Encompass focuses on the 17-month gap between Zako's complaint to HR in April 2017 and his termination in October 2018, but it fails to address Zako's subsequent complaints to Jean-

Francois, including in August 2018. ECF No. 42-1 at 20. Encompass cites cases acknowledging that periods of time under three months generally do give rise to an inference of causation. *Id.* (citing *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 423 (S.D.N.Y. 2018) (collecting cases and noting that "the passage of about two months between the protected activity and the adverse action appears to be the approximate dividing line")). I find that the temporal proximity between Zako's August 2018 complaint and his October 2018 termination suffices to raise an inference of causation, and I deny the motion to dismiss his retaliation claims (Counts Seven and Eight).

### E.   Intentional Infliction of Emotional Distress (IIED) Claim (Count Nine)

Count Nine of the second amended complaint alleges that Encompass's "persistent, pervasive, continuous and ongoing conduct and treatment of [Zako] was intentional and so severe that [Encompass] should have known that it would result in extreme emotional distress, and in fact it did result in [Zako's] extreme emotional distress." SAC ¶ 120. Encompass moves to dismiss this count, arguing that the conduct Zako alleges does not rise to the level of "extreme and outrageous." ECF No. 32-1 at 26. I agree with Encompass.

Under Connecticut law, a plaintiff states a claim for IIED if he alleges: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Groth v. Grove Hill Med. Ctr., P.C.*, No. 3:14-CV-01563 RNC, 2015 WL 4393020, at *5 (D. Conn. July 15, 2015). Liability attaches only if the defendant's conduct is so extreme as to "exceed all bounds usually tolerated by decent society." *Id.* As Encompass argues, "insults, verbal taunts, threats, indignities, annoyances, petty

oppressions or conduct that displays bad manners or results in hurt feelings, even if unlawful, are usually not deemed extreme and outrageous conduct." *Craig v. Yale Univ. Sch. of Med.*, 838 F. Supp. 2d 4, 10 (D. Conn. 2011); *see Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 211 (2000) (finding that defendant's "ma[king] condescending comments to [plaintiff] in front of [plaintiff's] fellow colleagues," subjecting plaintiff to two psychiatric examinations, calling police to escort plaintiff from the building, and forcing plaintiff to take a leave of absence and then resign "may very well have been distressing and hurtful" but did not "constitute extreme and outrageous conduct within the meaning of the precedents"). The conduct that Zako alleges is limited to insults and indignities and one instance where his supervisor "lunged at [Zako] in an aggressive manner." SAC ¶ 16. None of this rises to the level of conduct that "exceed[s] all bounds usually tolerated by decent society." *Groth*, 2015 WL 4393020, at *5. Therefore, I grant the motion to dismiss Zako's IIED claim (Count Nine).[5]

### F.  Hostile Work Environment Claims (Count Ten)

The final count of Zako's complaint alleges that he was subjected to a hostile work environment that interfered with the conditions of his employment. SAC ¶ 127. Though Count Ten does not specify whether Zako is alleging a hostile work environment based on age discrimination or disability discrimination, he argues in his opposition brief that the complaint alleges facts showing "workplace animosity" on the basis of age, disability, and associational

---

[5] The cases Zako cites in his opposition brief, ECF No. 45 at 33–34, do not support his claim and are irrelevant. Neither *Gaudio v. Griffin Health Services Corp.*, 249 Conn. 523 (1999) nor *Howell v. New Haven Bd. of Educ.*, No. 3:02CV736 (JBA), 2005 WL 2179582, at *8 (D. Conn. Sept. 8, 2005) addresses any IIED claim at all. In *Oakes v. New England Dairies, Inc.*, the court held that a plaintiff did not need to prove the employer's liability for the tort of IIED in order to recover damages for "emotional distress" on a wrongful discharge claim. 219 Conn. 1, 9 (1991). And Zako again states that he incorporates a previous memorandum that was never filed on the docket. ECF No. 45 at 34.

disability. ECF No. 45 at 34. Reading the second amended complaint liberally and in Zako's favor, I construe Count Ten to assert Zako's discrimination claims—on the basis of age, disability, and associational disability—through a hostile work environment theory. Encompass argues that Zako has failed to allege a plausible hostile work environment claim on any of these bases.

### 1. Age-Related Hostile Work Environment

"To establish an ADEA claim based on hostile work environment, [a plaintiff] must show that []he was subjected to harassment 'sufficiently severe or pervasive to alter the conditions of [his] employment and create a hostile working environment,' and that the harassing conduct occurred because of h[is] age." *Pimenta v. Assa Abloy Sales & Mktg. Grp., Inc.*, No. CIV.A.3:04CV858, 2006 WL 3098762, at *6 (D. Conn. Oct. 31, 2006) (quoting *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993)). "In order for the harassment . . . to be actionable, the harassing conduct must have been so severely 'permeated with discriminatory intimidation, ridicule, and insult . . . to alter the conditions of the victim's employment.'" *Id.* (quoting *Harris*, 510 U.S. at 21. The workplace must have been both objectively and subjectively hostile. *Id.*

Zako alleges only one age-related comment made during his employment at Encompass: he alleges that Jean-Francois told him that "we have plenty of young guys that are willing to do the overnights." SAC ¶ 13. Zako does not allege that he was offended by this comment. And though Zako alleges that Encompass promoted and retained younger workers instead of him, he makes no allegations suggesting that there was any pervasive hostility towards him on account of

his age. Therefore, I find that Zako has not alleged any facts suggesting that he was subjected to severe or pervasive harassment because of his age.[6]

### 2. *Disability-Related Hostile Work Environment*

"To prevail on a hostile work environment claim" under the ADA, a plaintiff must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) (internal quotation marks omitted). The plaintiff must also allege facts suggesting that the harassing conduct was motivated by animus directed at his disability. *See, e.g.*, *Murphy v. BeavEx, Inc.*, 544 F. Supp. 2d 139, 151 (D. Conn. 2008) (granting summary judgment where comments were directed at plaintiff's job performance and not his multiple sclerosis condition).

The plaintiff must "subjectively perceive the conduct as abusive," and "the misconduct shown also must be severe or pervasive enough to create an objectively hostile or abusive work environment. Even an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered." *Fox*, 918 F.3d at 74 (internal citations omitted). "Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of 'the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

---

[6] Zako does not specifically defend this claim in his opposition brief, focusing only on a "hostile work environment related to his disability claims." ECF No. 45 at 34.

Zako pleads multiple specific examples of supervisors' harassing him for his frequent use of the bathroom and alleges that such conduct was "constant[]." For instance, he alleges that, starting in March 2017, Frank Albore "was constantly harassing him and making offensive and embarrassing comments related to his frequent use of the bathroom due to his bladder syndrome," "often" making comments such as "I would never want to take a road trip with you in the car." SAC ¶ 14. He alleges that on April 30, 2017, after Zako used the bathroom despite Albore's denying him a bathroom break, Albore "approached and lunged at [Zako] in an aggressive manner and said ' . . . We can settle this man to man." *Id.* ¶ 16. He also alleges that another supervisor, Zanzitis, "was giving him a hard time, harassing and mistreating him when he asked to go [to] the bathroom," and that Zanzitis "would shake his head in disgust, act in a demeaning fashion, get angry and cause [Zako] to feel embarrassed for having to use the bathroom." *Id.* ¶ 22. Zako has thus alleged that the teasing and harassment regarding his frequent use of the bathroom was pervasive: Albore "was constantly harassing him" starting in March 2017, Albore's behavior "continued and worsened" after that, and Zanzitis "was giving him a hard time, harassing and mistreating him" around August 2018. *Id.* ¶¶ 14, 22. The harassment involved a physically threatening incident, when Albore "lunged at [Zako] in an aggressive manner" and implied that they should fight to "settle this man to man." *Id.* ¶ 16.

Zako certainly alleges that he found his supervisors' conduct subjectively offensive, and he complained about the conduct repeatedly to Jean-Francois. And these allegations, taken as true, plausibly suggest an objectively hostile work environment as well. In *Fox v. Costco Wholesale Corp.*, the Second Circuit found the plaintiff raised a genuine dispute of material fact "as to whether the frequency and severity of [his coworkers'] mockery r[o]se to the level of an objectively hostile work environment" where his coworkers frequently mocked the verbal tics he

suffered on account of his Tourette's syndrome, and his supervisors did nothing to stop it. 918 F.3d at 76. Based on this precedent, I find that Zako has plausibly alleged an objectively hostile environment where his supervisors themselves constantly mocked Zako's frequent use of the bathroom and where one would "shake his head in disgust" when Zako had to use the bathroom. Moreover, the conduct can plausibly be imputed to Encompass since the harassment came from Zako's supervisors Albore and Zanzitis.

Therefore, I find that Zako has stated a claim for disability discrimination based on a hostile work environment, and I deny the motion to dismiss as to Count Ten.

### 3. *Associational Disability-Related Hostile Work Environment*

As discussed above, I find that Zako did not allege a claim for associational disability discrimination because he did not allege any of the three circumstances recognized in *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 432 (2d Cir. 2016). For the same reasons, I find that Zako has not alleged a hostile work environment on the basis of his son's disability since he does not allege any comments or conduct by Encompass employees related to insurance expenses, genetic predisposition to develop his son's disability, or distraction due to his son's disability. *Id.* Therefore, I find that Zako has not stated a hostile work environment claim based on associational disability discrimination.[7]

## V.   CONCLUSION

For all the foregoing reasons, Encompass's motion to dismiss, ECF No. 42, is GRANTED in part and DENIED in part. I grant the motion with respect to Counts Five, Six, and Nine. As to all other counts, the motion is denied.

---

[7] As with any age-based hostile work environment claim, Zako does not specifically defend an associational disability-based hostile work environment claim in his opposition brief. ECF No. 45 at 33–34.

Encompass's motion to stay discovery pending the Court's ruling on its motion to dismiss, ECF No. 49, is DENIED. As requested by the parties and adopted in the Court's June 1, 2020 order, ECF No. 63, all discovery shall be completed within 90 days following this order, and dispositive motions shall be filed 45 days after the close of discovery.

 

                                                        /s/
                                        Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
       June 30, 2020